# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 44308-2016

STATE OF IDAHO,

      Plaintiff-Respondent,

v.

LAURA L. SMITH,

      Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

Boise, January 2017 Term

2017 Opinion No. 10

Filed: February 2, 2017

Stephen W. Kenyon, Clerk

Appeal from the District Court of the First Judicial District of the State of Idaho, in and for Bonner County. Hon. Barbara A. Buchanan, District Judge.

The judgment of the district court is <u>affirmed</u>.

Sally J. Cooley, Deputy State Appellate Public Defender, Boise, argued for appellant.

Jessica Lorello, Deputy Attorney General, Boise, argued for respondent.

_____

EISMANN, Justice.

This is an appeal out of Bonner County from a conviction for aiding and abetting the delivery of psilocybin mushrooms to an undercover detective. The appeal contends that the district court erred in overruling an objection to an out-of-court statement made by the person from whom they purchased the mushrooms about his supplier on the grounds that it was hearsay and violated the Defendant's right to cross-examine the declarant. The appeal also challenges the sufficiency of the evidence to sustain the conviction. We affirm.

## I.

## Factual Background.

In early 2012, two detectives had been working undercover investigating the sale of illegal drugs out of a particular bar in Bonner County. During the course of that investigation, they met and talked with a man named Shawn Kendle several times. During those conversations, Mr. Kendle had made it very apparent that he was involved in the drug trade,

particularly in mushrooms and marijuana. One of the detectives who kept in contact with Mr. Kendle had arranged to meet at the bar on May 16, 2012, to purchase marijuana and psilocybin mushrooms. The officers were hoping to learn who his suppliers were.

One of the detectives was wearing a video camera on his person, which was designed not to be noticeable. The camera's microphone was not directional, so it picked up traffic noise on the highway in front of the bar when the detective was outside and crowd noise from the bar patrons when he was inside the bar. As a result, there was no intelligible record of most of the conversations with or in the presence of the detective.

At the trial, the detective was first asked to recount what had occurred on May 16, 2012. The detectives arrived at the bar at about 5:35 p.m. and, after parking their motorcycles, met with Mr. Kendle next to his pickup, which was parked next to the front door of the bar. Before going to the bar, the detectives had agreed that one of them would negotiate the purchase of marijuana and the other would negotiate the purchase of mushrooms. One detective negotiated with Mr. Kendle regarding purchasing marijuana, but Mr. Kendle had not secured it from his supplier, who lived in Washington. When it became apparent that the detectives would not go into Washington to purchase the marijuana or give Mr. Kendle the purchase money for him to do so, the first detective to testify during the trial stated that Mr. Kendle asked if they still wanted to purchase mushrooms. After receiving a positive response, the detective testified, without objection, that Mr. Kendle stated, "I've got her in the bar right now, the person to talk to." The detective testified that an agreement was reached to purchase an ounce of mushrooms for $150.00.

At that point, the prosecution played the video and asked the detective what it showed. He testified that the video showed the detectives and Mr. Kendle walking back into the bar. He was asked what they were seeing "in this shot right here?" and he answered: "The gentleman standing with his back in the green t-shirt to us is Mr. Kendle. He is standing at the bar talking to what he said was his person that could supply him with mushrooms." Defense counsel objected on the grounds of hearsay and the Confrontation Clause, and the district court overruled the objections.

The woman at the bar had red hair. The video showed Mr. Kendle talking with her and pointing toward his pickup parked in front of the bar, which could be seen through the bar's windows. She gathered her possessions and left the bar. The detective with the video camera

left the bar after she did, and video-taped her driving away. Mr. Kendle had previously told the detectives where she lived, so the detective estimated that the trip would not take long. The detective then went back into the bar. Over the next ten minutes, he went back outside a few times purporting to make a cell phone call and went back inside the bar.

On the last time the detective was outside the bar pretending to make a cell phone call, he saw the red-haired woman drive back to the bar and park in the parking space she had left. She was alone, and when she got out of her car she was carrying a brown paper bag. She walked over to the driver's side of Mr. Kendle's pickup, and the detective heard the pickup door open and close. She then walked around the front of the pickup and entered the bar. When she did so, she was not carrying the paper sack.

The detective walked back into the bar and joined the other detective at a table. Mr. Kendle walked over to the table, sat down, and suggested that they go outside to look at the detective's motorcycles, which were parked at the end of the building. They walked out the door, and the detectives turned left to walk to their motorcycles. Mr. Kendle turned right, walked to his pickup, and drove it over to where the motorcycles were parked. Mr. Kendle opened the driver's door, and the brown paper bag was on the driver's floorboard. The detective who had stayed inside the bar while the red-headed woman was gone reached into the pickup, grabbed the paper bag, and paid Mr. Kendle $150.00. The detective did not observe any other brown paper bags in the cab of the pickup. The paper bag contained about one ounce of psilocybin mushrooms.

The red-haired woman turned out to be Laura Smith, the Defendant. She was charged with aiding and abetting Mr. Kendle in delivering psilocybin mushrooms to the detective who had grabbed the paper bag. She pled not guilty, and the case was tried to a jury, who found her guilty. After she was sentenced, she timely appealed.

The appeal was initially heard by the Idaho Court of Appeals, which vacated Ms. Smith's conviction and remanded the case. We then granted the State's petition for review. In cases that come before this Court on a petition for review of a decision of the Court of Appeals, we do not review the decision of the Court of Appeals. We hear the case anew as if the appeal had initially come directly to this Court. *State v. Suriner*, 154 Idaho 81, 83, 294 P.3d 1093, 1095 (2013).

Ms. Smith raises three issues on appeal: (a) that the district court erred in overruling the Confrontation Clause objection to the detective's statement that the video showed Mr. Kendle

standing at the bar "talking to what he said was his person that could supply him with mushrooms"; (b) that the district court erred in overruling the hearsay objection to the same statement; and (c) that there was insufficient evidence to convict Ms. Smith. "[T]his Court will not address constitutional issues when a case can be decided upon other grounds." *State v. Lee*, 153 Idaho 559, 563, 286 P.3d 537, 541 (2012). Therefore, we will address the hearsay objection first, then, if necessary, the Confrontation Clause issue, and then, if necessary, the sufficiency of the evidence to support the jury verdict.

## II.

### Did the District Court Err in Overruling the Hearsay Objection?

While the detective was narrating what the video showed, he was asked what a scene showed. He responded:

> This is after we've come back. Both of us have—all three of us have come back into the bar. The gentleman standing with his back in the green t-shirt to us is Mr. Kendle. He is standing at the bar talking to what he said was his person that could supply him with mushrooms.

The person to whom Mr. Kendle was talking at that time was Ms. Smith. She objected on the ground that the statement was hearsay, and the court overruled the objection before the State could respond.

Prior to the above testimony, the detective had testified that he and Mr. Kendle had come to an agreement to purchase the mushrooms. The prosecutor asked what the detective did at that point, and the detective answered, "At that point I—Mr. Kendle says I've got her in the bar right now, the person to talk to." Thus, the detective's testimony to which there was a hearsay objection was recounting what Mr. Kendle had earlier stated about his source of mushrooms.

A statement is not hearsay if it is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." I.R.E. 801(d)(2)(E). "Idaho law does not require contemporaneous independent proof of a conspiracy. Idaho law simply requires that there be some evidence of conspiracy or promise of its production, before the court can admit evidence of statements made in furtherance of the conspiracy under I.R.E. 801(d)(2)(E)." *State v. Jones*, 125 Idaho 477, 485, 873 P.2d 122, 130 (1994). In this case, the court overruled the objection before the State could respond.

4

However, in a hearing prior to the commencement of the trial regarding the admissibility of the video, the State recounted to the district judge what the evidence would show.

> PROSECUTOR: They're talking about the mushrooms and he says he's got her in the bar which is for the mushrooms.
>
> . . . .
>
> . . . . So what we're dealing with here is two undercover officers, both hittin' the guy up for—for drugs and they successfully purchased drugs from him before on previous occasions. So they're trying to make the purchase of the drugs and he's going along with it and they move into the subject of mushrooms. Mushrooms is not something that I don't believe he typically deals in. He deals in marijuana. But he's got her in the bar, meaning that's the person he's goin'.
>
> If we played the tape further, the Officer is following him into the bar, he walks up, starts talkin' to [Ms. Smith], she packs up her stuff, walks out of the bar, and that's the end of tape one.
>
> Tape two is her coming back in her car, getting out of the car, carrying the bag of mushrooms, packing past this truck that we see in this video that he's leaning on, and then when she enters—re-opens the door and walks on past the truck does not have the bag of mushrooms anymore.
>
> The third tape defendant—or Kendle pulls his truck around to a more secluded area near the motorcycles that the officers are riding as part of their cover. Pulls the pickup over there. As the door opens, the bag is sitting on the floor at his feet. So that's the entire picture. And I believe that the jury is entitled to see the entire picture because even when he's in the bar talking with—he's up at the bar speaking to Ms. Smith, he points out the window and what's out the window is right where his truck is parked.
>
> . . . .
>
> Then she gets up, leaves, comes back, puts the shrooms in the pickup and on they go.

This statement by the prosecutor as to what the evidence would show was sufficient to represent that the State would present evidence showing a conspiracy between Mr. Kendle and Ms. Smith to deliver psilocybin mushrooms. The prosecutor also restated these events in his opening statement.

The evidence presented during the trial was sufficient to show that there was a conspiracy between Mr. Kendle and Ms. Smith to deliver psilocybin mushrooms to the detective and that the statement that he had his source in the bar was made during and in furtherance of the conspiracy.

The testimony from the detectives showed that they first attempted to purchase marijuana from Mr. Kendle, but they did not come to an agreement because Mr. Kendle stated that his supplier was in the state of Washington. The detectives would not give him the purchase money based upon his promise to go to Washington and buy the marijuana, nor would they agree to go

5

to Washington with him to purchase the marijuana. Then the discussion turned to the purchase of psilocybin mushrooms. The detective who was going to purchase the mushrooms testified that Mr. Kendle said that "the mushrooms were local, the person was in the bar, and she lived locally." Mr. Kendle also told them the street on which she lived in the town. He then said, "I've got her in the bar right now, the person to talk to." The statement that "I've got her in the bar right now" shows that there was an existing agreement between Mr. Kendle and the woman for the distribution of mushrooms, and the statement was made in furtherance of the conspiracy because it was to convince the detective that Kendle's supplier was local, so they could obtain the mushrooms without leaving town.

After making these statements, Mr. Kendle went into the bar, walked up to Ms. Smith, and had a discussion with her, during which he pointed to his pickup parked in front of the bar. She left and returned about ten minutes later with the paper bag containing the mushrooms, which she placed in the driver's side of his pickup. Mr. Kendle then exchanged the paper bag for $150.00 from the detective. The mushrooms were in a plastic baggie in the paper bag. The jury found, beyond a reasonable doubt, that Ms. Smith aided and abetted Mr. Kendle in delivering psilocybin mushrooms to the detective. The evidence clearly shows that there was a conspiracy between Mr. Kendle and Ms. Smith to deliver the mushrooms to the detective.

Although neither party argued on appeal whether the statement was made by a co-conspirator during the course of and in furtherance of the conspiracy, it clearly was. "[A] conspiracy is established upon proof beyond a reasonable doubt that there is an agreement between two or more individuals to accomplish an illegal objective, coupled with one or more overt acts in the furtherance of the illegal purpose accompanied by the requisite intent to commit the underlying substantive offense." *State v. Garcia*, 102 Idaho 378, 384, 630 P.2d 665, 671 (1981). "[A] person is guilty of conspiracy to deliver a controlled substance under Idaho Code section 37–2732(f) when she and another person agree to deliver a controlled substance." *State v. Goggin*, 157 Idaho 1, 13, 333 P.3d 112, 124 (2014).[1] "To 'aid and abet' means to assist, facilitate, promote, encourage, counsel, solicit or incite the commission of a crime." *Howard v. Felton*, 85 Idaho 286, 297, 379 P.2d 414, 421 (1963). A person who aids and abets the

---

[1] Idaho Code section 37–2732(f) states, "If two (2) or more persons conspire to commit any offense defined in this act, said persons shall be punishable by a fine or imprisonment, or both, which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the conspiracy."

6

commission of a crime must "knowingly participate[] by any of such means in bringing about the commission of a crime. It contemplates a sharing by the aider and abettor of the criminal intent of the perpetrator." *Id.* The same conduct can constitute aiding and abetting the delivery of an unlawful drug and a conspiracy to deliver the drug. *State v. Sterley*, 112 Idaho 1097, 1100, 739 P.2d 396, 399 (1987). Under the facts of this case, the verdict that Ms. Smith aided and abetted Mr. Kendle in delivering the psilocybin mushrooms to the detective also showed a conspiracy to deliver them to the detective.

The issue should be decided on the applicable law, and the statement was not hearsay under Idaho Rule of Evidence 801(d)(2)(E). Therefore, the district court did not err in overruling the objection because the challenged statement was not hearsay.

## III.

### Did the District Court's Ruling Violate the Confrontation Clause?

During the pretrial hearing on the admissibility of the audio portion of the video, defense counsel made an objection to the audio portion on the ground that he did not get to cross-examine Mr. Kendle. That objection would be based upon the Confrontation Clause of the Sixth Amendment.

The Supreme Court has held that the Sixth Amendment's right of an accused to confront the witnesses against him applies to the States under the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965). The Supreme Court has "never suggested . . . that the Confrontation Clause bars the introduction of all out-of-court statements that support the prosecution's case. Instead, we ask whether a statement was given with the 'primary purpose of creating an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, ___ U.S. ___, ___, 135 S. Ct. 2173, 2183 (2015).

In *Ohio v. Roberts*, 448 U.S. 56 (1980), the Supreme Court held that the scope of the Confrontation Clause was essentially coextensive with the hearsay rule. The Court stated:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

7

*Id*. at 66 (footnote omitted).

"In *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L.Ed.2d 177 (2004), [the Court] adopted a different approach. [It] explained that 'witnesses,' under the Confrontation Clause, are those 'who bear testimony,' and we defined 'testimony' as 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Ohio v. Clark,* ___ U.S., at 135, S. Ct. at 2179. As the Court attempted to flesh out what was meant by a testimonial statement, it announced what became known as the "primary purpose" test. *Id.* The Court held that statements are testimonial "'when the circumstances objectively indicate . . . that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* at ___, 135 S.Ct. at 2180. In the primary purpose test, the inquiry must consider all of the relevant circumstances. *Id.* In *Ohio v. Clark*, the Court set forth several factors to be considered when determining whether the hearsay statement was testimonial.

### 1. Was the primary purpose of the statement to establish facts of a past crime?

The Court explained that hearsay statements "are testimonial when the circumstances objectively indicate . . . that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id*. at ___, 135 S. Ct. at 2179–80. In *Crawford*, the nontestifying witness's statements were made while she was in police custody, and her statements were "[i]n response to often leading questions from police detectives, she implicated her husband in [the victim's] stabbing and at least arguably undermined his self-defense claim." 541 U.S. at 65. In *Davis v. Washington*, the statements were made to a 911 emergency operator from the victim of domestic violence. 547 U.S. 813, 817 (2006). The *Davis* Court explained:

> When we said in *Crawford* that "interrogations by law enforcement officers fall squarely within [the] class" of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator.

*Id.* at 826 (internal citation omitted). The *Davis* Court then distinguished *Crawford* by stating:

> The difference between the interrogation in *Davis* and the one in *Crawford* is apparent on the face of things. In *Davis,* McCottry was speaking about events *as they were actually happening,* rather than "describ[ing] past events," Sylvia

8

Crawford's interrogation, on the other hand, took place hours after the events she described had occurred.

547 U.S. at 827 (internal citation omitted).

The purpose of the challenged statement in this case was not to establish or prove past events that were potentially relevant to a criminal prosecution. The challenged statement was a recounting of what the officers had been told by Mr. Kendle regarding an ongoing event. Detective Mattingley had earlier testified, without objection, to what Mr. Kendle had said. His testimony was as follows:

> Q. Did you try to negotiate any other controlled substance purchases?
> A. Well, when—when we kind of came to the conclusion, both my partner and I, that this wasn't probably gonna happen, Mr. Kendle made—made the statement that he could supply us with mushrooms. Psilocybin mushrooms.
> Q. Okay. And were you guys in agreement with purchasing mushrooms?
> A. Yeah. We were. Yes.
> Q. Okay. And what did you do at that point then?
> A. At that point I—Mr. Kendle says I've got her in the bar right now, the person to talk to.

The challenged statement was not elicited by interrogating Mr. Kendle, and it had nothing to do with a past crime.

**2. Was the statement elicited during a formal interrogation?**

In *Ohio v. Clark*, the Court stated: "One additional factor is 'the informality of the situation and the interrogation.' A 'formal station-house interrogation,' like the questioning in *Crawford,* is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." ___ U.S. at ___, 135 S. Ct. at 2180 (citations omitted). In the instant case, the challenged testimony was not elicited during a formal interrogation, or even during an informal interrogation. It was volunteered by Mr. Kendle.

**3. When the statement was made, did the declarant reasonably expect that the statement would be used in the prosecution of a crime?**

In *Crawford*, the Court stated as one factor the declarant's purpose for making the statement. Was the declarant's purpose to provide testimony accusing another of a crime? The Court stated:

The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused—in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.

541 U.S. at 51. The Court then gave as examples of testimonial statements:

Various formulations of this core class of "testimonial" statements exist: "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

541 U.S. at 51–52 (citations omitted).

In *Davis*, the Court was addressing whether answers to questions from a 911 operator constituted testimonial statements. In holding that they did not, the Court stated:

We conclude from all this that the circumstances of McCottry's interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. She simply was not acting as a *witness;* she was not *testifying*. . . . No "witness" goes into court to proclaim an emergency and seek help.

547 U.S. at 828.

In *Michigan v. Bryant*, 562 U.S. 344 (2011), the issue was whether answers to police questioning by the victim of a shooting made after the police discovered him mortally wounded in a gas station parking lot were testimonial. One of the factors weighing in favor of finding that the victim's answers were not testimonial was the fact that the victim's purpose in answering the questions was not to establish past events for a criminal prosecution. The Court stated:

His answers to the police officers' questions were punctuated with questions about when emergency medical services would arrive. He was obviously in considerable pain and had difficulty breathing and talking. From this description of his condition and report of his statements, we cannot say that a person in Covington's situation would have had a "primary purpose" "to establish or prove past events potentially relevant to later criminal prosecution."

10

*Id.* at 375 (citations omitted).

In *Ohio v. Clark*, the statements at issue were made by a three-year-old boy in response to questioning by his teachers regarding marks on his body indicating that he had been abused. ___ U.S. at ___, 135 S. Ct. at 2181. One of the factors showing that the child's statements were not testimonial was that he would not have intended that his statements would be a substitute for trial testimony. The Court stated:

> L.P.'s age fortifies our conclusion that the statements in question were not testimonial. Statements by very young children will rarely, if ever, implicate the Confrontation Clause. Few preschool students understand the details of our criminal justice system. Rather, "[r]esearch on children's understanding of the legal system finds that" young children "have little understanding of prosecution." And Clark does not dispute those findings. Thus, it is extremely unlikely that a 3–year–old child in L.P.'s position would intend his statements to be a substitute for trial testimony.

*Id*. at ___, 135 S. Ct. at 2181–82 (internal citations omitted).

There is nothing indicating that Kendle knew he was talking to detectives or that he reasonably understood that his statements to them would be used in a criminal prosecution. Therefore, this factor weighs against finding that his statements were testimonial.

Considering all of these factors, the out-of-court statements made by Mr. Kendle were not testimonial. Therefore, testimony by the detectives regarding those statements did not violate the Confrontation Clause.

## IV.

### Was There Sufficient Evidence to Support the Jury Verdict?

"This Court will not overturn a judgment of conviction, entered upon a jury verdict, where there is substantial evidence upon which a reasonable trier of fact could have found that the prosecution sustained its burden of proving the essential elements of a crime beyond a reasonable doubt." *State v. Sheahan*, 139 Idaho 267, 285, 77 P.3d 956, 974 (2003). "Evidence is substantial if a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact has been proven." *State v. Eliasen*, 158 Idaho 542, 546, 348 P.3d 157, 161 (2015). A conviction can be based primarily upon circumstantial evidence, *State v. Stevens*, 93 Idaho 48, 50-51, 454 P.2d 945, 947-48 (1969), and "even when circumstantial evidence could be

interpreted consistently with a finding of innocence, it will be sufficient to uphold a guilty verdict when it also gives rise to reasonable inferences of guilt," *State v. Severson*, 147 Idaho 694, 712, 215 P.3d 414, 432 (2009).

Ms. Smith contends on appeal that there was insufficient evidence to support the jury verdict because:  (a) "there is no admissible evidence Ms. Smith and Mr. Kendle were working together to procure and deliver the mushrooms"; (b) "there is no evidence that the bag held by Ms. Smith contained psilocybin mushrooms and there is no evidence that Ms. Smith knew or believed that it contained illegal drugs"; (c) "[t]here is no evidence that Ms. Smith put the brown paper bag in the truck"; (d) "there is no evidence that there was only one brown paper bag in Mr. Kendle's truck"; (e) "[e]ven supposing that Ms. Smith did place the brown paper bag in Mr. Kendle's truck, there was no evidence establishing that the bag Detective Hight procured was the same bag that Ms. Smith put in Mr. Kendle's truck"; (f) "the officers never heard what Mr. Kendle said to Ms. Smith and never saw any money exchange hands"; (g) "[n]o fingerprints matching those of Ms. Smith were found on the drugs; the bag was not even fingerprinted"; and (f) Ms. Smith was never caught with any of the buy money."

As shown above in recounting the evidence, there was clearly sufficient direct and circumstantial evidence, including reasonable inferences drawn from the evidence, to convict Ms. Smith.  Therefore, her conviction will be affirmed.

## V.
### Conclusion.

We affirm the judgment of conviction.


Chief Justice BURDICK, and Justices JONES, HORTON, and BRODY **CONCUR.**